**SIGNED THIS: December 8, 2025**

_____

**Mary P. Gorman**
**United States Bankruptcy Judge**
_____

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| In Re | ) | |
| | ) | Case No.    24-90493 |
| STEVEN DWAYNE DUBY, | ) | |
| | ) | Chapter 7 |
| Debtor. | ) | |

## O P I N I O N

Before the Court after trial, is the Debtor's Motion to Convert from Chapter 7 to Chapter 13. For the reasons set forth herein, the Motion will be denied.

### I.      Factual and Procedural Background

The Debtor, Steven Dwayne Duby, filed his voluntary Chapter 7 petition on October 2, 2024. The Debtor had previously commenced a Chapter 7 case by filing a petition on September 22, 2024.[1] His first case was dismissed because

---

[1] *In re Steven Dwayne Duby*, Case No. 24-90473, filed in the Central District of Illinois.

he failed to file a list of the names and addresses of the creditors and parties in interest included in his schedules as required by the rules. The Debtor was represented in both filings by Attorney Neal H. Levin.

Relevant to the issues here, the Debtor filed his Chapter 7 Statement of Your Current Monthly Income (Official Form 122A-1) wherein he stated that he had no income of any type during the six months prior to the case filing. Similarly, he answered question 4 on his Statement of Financial Affairs by indicating that he had no wages, commissions, bonuses, tips, or business income in the last three years. He disclosed that, in each of 2022 and 2023, he had received $23,444 from his mother. On his Schedule I, he said that he received $1000 per month from his spouse. His Schedule J disclosed $874 in monthly expenses.

The Debtor subsequently retained Attorney Michael Meyers who filed an appearance on November 1, 2024. In an amended Statement of Financial Affairs filed December 7, 2024, the Debtor again said that his only income during the last three years was $23,444 in 2022 and 2023; he characterized the payments in his amended filing as "Agricultural Program Payments." In an amended Chapter 7 Statement of Your Current Monthly Income filed December 11, 2024, the Debtor again said that he had no income during the six months before filing. In an amended Schedule I also filed December 11, 2024, he said that he had no income but disclosed that his wife was employed earning a little more than $11,000 per month gross; after taxes and other deductions, her net monthly income was shown as $8716.70. The Debtor also included a note on the

amended Schedule I that, as of January 1, 2025, his wife would be going on disability leave earning two-thirds of her regular pay for six months and then would retire on July 1, 2025, and have only Social Security income. The related amended Schedule J filed at the same time disclosed combined household expenses for the Debtor and his wife of $4559.53 resulting in a net income of $4157.17. The amended Schedule J contained a cryptic note stating that the Debtor's wife was anticipating working out a payment plan with the IRS requiring payments between $3000 and $5000 per month.

In February 2025, Attorney Jeana Reinbold entered her appearance for the Debtor. Attorney Reinbold filed several amended documents for the Debtor but none that changed the financial information contained in the amendments filed by Attorney Meyers.

In the meantime, a creditor, LHT Investors, L.L.C., filed an adversary complaint against the Debtor seeking to have his discharge denied or, alternatively, to have the debt alleged to be owed to it by the Debtor excepted from the Debtor's discharge. With respect to the denial of the Debtor's discharge, LHT alleged that the Debtor made transfers within one year of filing with the intent to hinder or delay creditors, did not keep proper records of his financial transactions, made false statements in his bankruptcy filings, failed to satisfactorily explain the loss of his assets, and filed false statements in a related case in Delaware. With respect to the request to except the debt owed to it from discharge, LHT alleged that the Debtor committed actual fraud, made false representations, made statements in writing that were materially false, acted in

a manner that constituted fraud or defalcation as a fiduciary, and willfully and maliciously injured LHT or its property. The Debtor has answered the complaint, and it remains pending.

In June 2025, Attorney Reinbold filed the Motion to Convert now before the Court. In the Motion, the Debtor claimed to be eligible for Chapter 13 because his debts were within the statutory limits. He also asserted that he could propose and make payments through a plan and was acting in good faith. LHT objected to the Motion, pointing out that there was no automatic stay in the case because no motion to extend the stay had been filed despite the dismissal of the Debtor's first case shortly before this case was filed. LHT also pointed out that the Debtor had failed to file tax returns for a number of years and claimed that the Debtor was acting in bad faith. Neither party specifically mentioned the Debtor's apparent total lack of income.

At an initial hearing on the Motion to Convert, Attorney Reinbold suggested that the Debtor had an absolute right to convert and that the issues raised by LHT could be taken up with plan confirmation. She acknowledged that the Debtor had little employment when he filed but said that he was prepared to come out of retirement and had lined up employment for which he would be paid $150,000 per year. She said that he had now filed his tax returns and expected the taxing authorities to file amended claims. Although Attorney Reinbold asserted that the Motion to Convert should be granted as a matter of right and without further hearing, LHT's attorney agreed with the Court that an evidentiary

hearing was needed. An evidentiary hearing was initially set for August 29, 2025, and later continued to September 24, 2025, at the request of the Debtor.

At the evidentiary hearing, the Debtor first called Larry Gray, a certified public accountant, as a witness. Mr. Gray stated that he had been working as an accountant since 1977; he presented a lengthy resume of work experience, published articles, and past speaking engagements. He was quickly, and without objection, qualified to testify as an expert in the field of accounting.

Mr. Gray said that he had been hired by the Debtor to review the income reported on the Debtor's tax returns for the years 2018 through 2024 and to compare that income to IRS transcripts for the same years. He explained that the transcripts listed all income reported to the IRS by third parties as paid to the Debtor in the years in question. He obtained the transcripts directly from the IRS using a power of attorney. He obtained copies of the Debtor's tax returns from the Debtor's prior accountant, Gary Gray.[2]

Upon review of the transcripts, Mr. Gray discovered that the Debtor had significant cancellation-of-debt income reported in 2018. Specifically, Mr. Gray said that, in 2018, a commercial loan owed by the Debtor had been reported cancelled in the amount of $673,179 and that a 1099C had been issued by the lender reporting the transaction to the IRS at that time. He explained that a 1099C is a report to the IRS that the taxpayer has had a debt cancelled and may potentially owe taxes based on that cancellation. Mr. Gray said that he had frequently consulted with banks over the years on whether a 1099C should be

---

[2] Despite the coincidence of the same last name, Larry Gray said that he was not related to Gary Gray.

issued for particular transactions; he said that the guidelines for issuance are not clear cut, and many smaller banks struggle with deciding whether to issue a 1099C or some other report based on the specifics of a transaction.

Mr. Gray said that he had reviewed the circumstances of the issuance of the 1099C to the Debtor in 2018 and believed that the issuance was in error. He opined that when or whether a debt has been released is a question of state law and, based on his investigation, the Debtor here was not released from liability on the debt until 2023.[3] Accordingly, Mr. Gray believed that the 1099C should not have been issued until 2023. He went on to explain that whether a taxpayer actually owes taxes based on the cancellation of debt depends on whether the taxpayer has tax attributes such as insolvency to offset any purported liability. In this case, he said that he had reviewed the Debtor's bankruptcy schedules that showed over $7 million dollars of liabilities and the claims filed in this case totaling over $10 million dollars. He concluded from those documents that the Debtor was insolvent in 2023, and the amount of that insolvency would have been sufficient to offset any potential tax liability had the 1099C been issued for 2023.

With respect to the other tax years, Mr. Gray said that, from 2018 through 2023, the transcripts reported income from government farm payments in amounts ranging from $17,500 to $23,000 per year.[4] He said that those amounts

---

[3] Mr. Gray did not provide any factual basis for his opinion. He was not asked either during direct examination or cross-examination what facts he relied on in drawing an admittedly legal conclusion that the cancellation of debt occurred in 2023 rather than 2018. He did not state his qualifications to give what he had identified earlier as a legal rather than an accounting opinion.
[4] The payments are identified on the transcripts as "Agricultural Subsidies."

were taxable and that the Debtor should have filed returns in those years to claim expenses associated with earning the payments and thereby reduce the amounts due to the IRS. He expressed the opinion that the Debtor should have filed returns for all such years. For 2024, the transcripts disclosed only $39 of income; Mr. Gray said that the Debtor would not have been required to file a return for that year. He also explained that no interest or penalties would be charged for the failure to timely file a return in any year that no taxes were due.

The Debtor's attorney asked Mr. Gray several questions about whether he believed the Debtor had acted in good faith in relation to the filing of his tax returns. Although Mr. Gray demurred several times asserting that he could not answer the questions, he finally agreed with Attorney Reinbold that the Debtor had acted in good faith. In doing so, he largely relied on his prior testimony about the complexity of dealing with cancellation-of-debt income.

Under cross-examination by the attorney for LHT, Mr. Gray admitted that his determination of the Debtor's insolvency was based on 2023 information—he had not analyzed the Debtor's solvency in 2018. He also agreed that he had not received or reviewed any information about expenses that might offset the government farm payments. Mr. Gray acknowledged that he had not reviewed all the claims filed by the IRS in the case but upon a brief review at the hearing was able to say that the claims could be disputed. He said that the claims were based on substitute returns that would have included all the Debtor's reported income but none of the Debtor's available deductions; he characterized the claims as being the "worst case" calculations of what the Debtor might owe.

Under redirect examination by the Debtor's attorney, he said that he had recommended to the Debtor that additional work be done to review his tax situation and to file amended returns as needed.

The Debtor testified on his own behalf. He said that he lived in Kankakee, Illinois, with his wife, Kathleen, to whom he has been married since 1982. He holds a Bachelor of Science degree in engineering and worked for General Electric for many years, retiring in the early 2000s. He said that he had bought real estate over the years, including multi-family, office, and industrial buildings that he rehabbed and developed.

When asked what his income was when he filed this case, the Debtor responded "zero." His attorney then asked him if he really meant to say "zero" considering his receipt of the government farm payments; he responded first by saying "no" and then later "correct." The implication of the question was that the Debtor received the government farm payment income in 2024. His response, however, was unclear. He also said that his wife worked at a hospital as an ultrasound technician and earned a good income. He stated that she recently had surgery and would be retiring in October or November.

The Debtor said that he was coming out of retirement and would be working for his son who he described as a banker in Chicago. He said that the new company created by his son was going to explore the Texas real estate market and that he would provide consultation and help in evaluating development opportunities. The Debtor claimed that he was going to be paid $150,000 per year for approximately 20 to 30 hours of work per week. He said

that the new company was in the capital formation stage, and he had not yet received any compensation but expected his pay to begin "Octoberish."

As to his schedules and other documents filed in the case, the Debtor said that he had spent a lot of time gathering information and believed that the documents he signed were complete. He said that he had not originally listed the IRS or the Illinois Department of Revenue as creditors because he did not believe that he owed any taxes. After filing, however, he received a notice from the IRS asserting a claim against him. He said that he still believes that he does not owe any taxes and hired legal counsel and Larry Gray to assist him with respect to his tax matters. He acknowledged that the State Bank of Davidson had issued a 1099C for the cancellation of debt in 2018, but he denied receiving the 1099C at the time. He admitted that he had quickly filed returns for missing years after filing this case because such returns were required; he said that he knew that those returns would eventually need to be amended.

The Debtor reviewed a listing of filed claims. He acknowledged that he owed sums to law firms that had represented him in prior litigation and to several credit card companies. He said that he did not owe LHT the $10 million dollars it claimed he owed. He said that he had scheduled LHT as a contingent, unliquidated, and disputed creditor.

Under cross-examination by LHT's attorney, the Debtor said that the government farm payments discussed by Larry Gray related to a farm owned by his mother who assigned the payments to him in consideration of help he provided her. He said that he was unsure of why the payments were owed to his

mother, for how long the payments had been made, and whether he had included the payments assigned to him on all his tax filings. He said that he obtained the assistance of Gary Gray in filing the missing returns.

As for his schedules and other documents filed in this case, the Debtor said that he had reviewed and personally signed them all. He said that his prior attorneys told him that the dismissal of his first filing was caused "by a mistake on their end." He also reviewed and signed all amendments filed.

The Debtor described the new business venture by which he expected to be employed as being formed by his son and named HHI Development Partners. He said that the business intended to undertake development projects but had no income yet. He agreed that the business was still going through capital formation. He admitted that he had not yet received any pay and had no employment contract or pay advices evidencing his involvement in the business.

Continuing under cross-examination, the Debtor said that he had provided his tax returns to Roger Prillaman, the Chapter 7 trustee. He did not know if he had provided the returns to his original attorneys. He said that he had no notice that he owed taxes prior to filing bankruptcy. He acknowledged that his wife also owed taxes related to withdrawals from her pension plan but denied knowing how much she owed. He said that his wife was currently on disability leave and that she would be retiring by the end of the year. He claimed that her only income thereafter would be Social Security; he denied having any knowledge of the amount of Social Security benefits she might receive. He identified a copy of an IRS tax levy issued in October 2024 but claimed that he

had never discussed the levy with his wife and was not sure how the document had been produced in this case. He said that he did not know how his wife would pay the taxes she owes after her income is reduced.

On redirect examination by his attorney, the Debtor said that he had produced a volume of documents to his several attorneys and may have produced a copy of the IRS levy to one of his attorneys. He clarified that he was aware of his wife's tax liability and that a tax lien had been filed against their residence that is solely owned by his wife. He said that Larry Gray had been engaged to assist his wife in negotiations with the IRS. He also said that his son had started the new business and that he was currently engaged in the business and would be paid in October.

After the Debtor rested his case, LHT's attorney called Roger Prillaman, the Chapter 7 trustee, as a witness. Mr. Prillaman said that, shortly after the case was filed, he requested a routine list of documents from the Debtor's attorneys. He identified emails sent to the attorneys by his assistant with the list attached. Included on the list was a request for the two most recent years of tax returns. Mr. Prillaman identified an email that he received from the Debtor's attorney's office with copies of 2022 and 2023 tax returns attached. He said that he assumed the returns had been filed and was never told by the Debtor's attorneys that they were not filed. Nevertheless, he later learned that the returns had not been filed. The IRS proof of claim had raised his suspicions because the claim showed unfiled returns for both years.

LHT's attorney asked Mr. Prillaman whether, after four creditors meetings, he believed that he had a "clear handle" on the Debtor's assets and transfers over the last ten years. Mr. Prillaman responded that he believed that he had a good handle on the Debtor's tangible assets but still had questions about transfers. He said that, in 2018, the Debtor had transferred $188,000 from one of his LLCs to his son, Jerod Duby. The Trustee had questions about that transfer and said that it might be reachable if the IRS remains a creditor in the case and thereby extends the statute of limitations to reach a fraudulent conveyance to 10 years. Mr. Prillaman also said that Jerod Duby was a target in the Texas litigation filed by LHT, although he understood that Jerod Duby might have settled the claims against him.

Mr. Prillaman said that he had initially been told that the Debtor had a family trust, the Hidden Oaks Family Trust. After requesting documents, however, he received an affidavit saying that the trust had never existed. Mr. Prillaman also attempted to get information from the Debtor's non-filing spouse. He said that the Debtor and his spouse live in a very nice home in Kankakee, Illinois, that was jointly owned until the early 2000s when it was transferred to the spouse alone through an Illinois land trust. Although he had questions about the home, he said that he learned that there was a substantial tax lien by the IRS on the home. He understood that the Debtor's spouse had made withdrawals from a 401k or 403b plan and incurred tax liabilities that remained unpaid resulting in the lien. He was interested in seeing the spouse's 2018 tax return, but Attorney Reinbold had been unable to provide the return, telling Mr.

Prillaman that there were tensions in the household due to the parties' financial problems.

Under cross-examination by Ms. Reinbold, Mr. Prillaman acknowledged that he had conducted four creditors meetings, several of which were very long and difficult. He agreed that, during those meetings, the issue of the errors made by the Debtor's original attorneys was discussed. He said that both Attorney Meyers and Attorney Reinbold had made efforts to correct those errors. He had a sense that the case was hurriedly filed by Chicago attorneys who did not know what they were doing.

Mr. Prillaman agreed that he had not objected to the Motion to Convert. He also agreed that, after obtaining several extensions of time to file an objection to the Debtor's discharge, he never filed the objection. He volunteered, however, that he had made a referral of the Debtor to the United States Trustee for the purpose of the filing of an objection to discharge. He said that the decision had been made that, because an objection to discharge had been filed by LHT, he and the UST would leave prosecution of the discharge objection in the hands of the creditor.

The parties concluded with brief closing arguments. The matter is ready for decision.

## II.     Jurisdiction

This Court has jurisdiction over the issues before it pursuant to 28 U.S.C. §1334. All bankruptcy cases and proceedings filed in the Central District of

Illinois have been referred to the bankruptcy judges. CDIL-Bankr. LR 4.1; *see* 28 U.S.C. §157(a). Matters involving the administration of an estate or the adjustment of the debtor-creditor relationship are core proceedings. 28 U.S.C. §157(b)(2)(A), (O). The matters here arise directly from the Debtor's bankruptcy itself and from the provisions of the Bankruptcy Code and may therefore be constitutionally decided by a bankruptcy judge. *See Stern v. Marshall,* 564 U.S. 462, 499, (2011).

### III.    Legal Analysis

Section 706 provides that a debtor may convert a Chapter 7 case to a Chapter 13 case if the case has not already been converted under another section and if the debtor is eligible for relief under Chapter 13. 11 U.S.C. §706(a), (d). Eligibility to be a Chapter 13 debtor is limited to individuals with "regular income." 11 U.S.C. §109(e). An individual with regular income is one "whose income is sufficiently stable and regular to enable such individual to make payments under a plan[.]" 11 U.S.C. §101(30). The focus of the income inquiry is on the regularity and stability of the income, and regular income may include not only earned income but also government benefits, child support, pension or investment income, or contributions from family members. *In re Durov*, 2017 WL 977026, at *5 (Bankr. C.D. Ill. Mar. 10, 2017) (citations omitted).

In addition to the statutory conditions for eligibility, the Supreme Court has held that a debtor who engages in prepetition bad faith conduct such that his Chapter 13 case would be dismissed or converted is also not eligible to be a

Chapter 13 debtor. *In re Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 373-75 (2007). The Court in *Marrama* explained that, when a debtor is not "honest but unfortunate" and therefore not part of the class of persons that bankruptcy laws were designed to protect, such debtor's right to convert under §706(d) may be denied. *Id.* at 374.

In making their presentations, the Debtor and LHT both raised the regular income issue and the bad faith issue. Because, however, the Debtor does not have regular income and on that basis alone is not eligible to be a Chapter 13 debtor, the bad faith issue will not be discussed or resolved in this Opinion; only the regular income issue will be analyzed.

Two threshold issues arise when considering whether a debtor has regular income. First is the issue of the burden of proof. Generally, a debtor has the initial burden of establishing eligibility for a bankruptcy filing. "The burden of establishing eligibility in bankruptcy lies with the party filing the bankruptcy petition." *In re Montgomery*, 37 F.3d 413, 415 (8th Cir. 1994). "It is incumbent upon a Chapter 13 debtor to sufficiently demonstrate an ability to fund the plan from sources which are stable and regular." *In re Tucker*, 34 B.R. 257, 262 (Bankr. W.D. Okla. 1983) (citation omitted). "The better rule assigns to the debtor the ultimate burden of persuasion with respect to eligibility." Keith M. Lundin, LUNDIN ON CHAPTER 13, §9.4, at ¶2, LundinOnChapter13.com/Content/Section/9.4 (last visited Dec. 5, 2025). On the issue of whether the Debtor here has the regular income necessary to establish Chapter 13 eligibility, the Debtor has the burden of proof.

Second is the issue of at what point in time the existence of regular income should be determined. Some courts hold that the measuring date is as of the petition filing. *See, e.g., In re Robinson*, 535 B.R. 437, 443 (Bankr. N.D. Ga. 2015). Others take a more flexible approach suggesting that if a debtor's income changes, the analysis may include such changes. *See, e.g.*, *Tucker*, 34 B.R. at 262; *Matter of Moore*, 17 B.R. 551, 553 (Bankr. M.D. Fla. 1982); *Matter of Cole*, 3 B.R. 346, 348 (Bankr. S.D. W. Va. 1980). In the context of conversion, the best approach is to consider eligibility at the time conversion is requested. Keith M. Lundin, LUNDIN ON CHAPTER 13, §11.2, at ¶5, LundinOnChapter13.com/Content/Section/11.2 (last visited Dec. 5, 2025); *see also In re Santiago-Monteverde*, 512 B.R. 432, 443 (S.D.N.Y. 2014) (debtor must be eligible when seeking conversion); *cf. Durov*, 2017 WL 977026, at *5 (debtor must meet income eligibility by the time motion to dismiss is heard). Here, it is not necessary to pick a precise date for the determination because, as will be explained below, the Debtor failed to prove that he had regular income on the petition date, on the date he filed his Motion to Convert, or on the date the Motion to Convert was heard.

The Debtor has raised three potential sources of regular income: contributions from his non-filing spouse, government payments assigned to him by his mother, and a potential salary from his son's new business. Each source will be discussed.

### A. Contributions from Non-Filing Spouse

On his initial Schedule I, the Debtor claimed that he received $1000 per month from his non-filing spouse. He also itemized $874 in monthly expenses on his Schedule J, although some of the expenses such as food and housekeeping supplies appeared to be his share of joint household expenses rather than expenses personal to him. The Debtor's amended Schedules I and J showed all household income as earned by his spouse and all expenses as paid by her directly rather than by paying amounts to the Debtor for him to use to pay some expenses. The amended schedules also noted an anticipated reduction in the spouse's income due to expected surgery and retirement and an anticipated increase in expenses due to a projected installment payment required to be made to the IRS. Considering all such anticipated changes, the amended schedules filed in December 2024 established only that the spouse might be able to continue to pay all joint household expenses but not that she could contribute any sum to the Debtor for use in making plan payments.

"[G]ratuitous payments by family members and other third parties have not, as a general rule, been held to constitute 'regular income' for purposes of the Bankruptcy Code." *In re Antoine*, 208 B.R. 17, 19 (Bankr. E.D.N.Y. 1997). Cases that allow such gratuitous payments to establish Chapter 13 eligibility generally do so only upon proof of the family member's "willingness, ability, duty, [or] commitment to make such contributions." *In re Dionne*, 2024 WL 2262625, at *3 (Bankr. D.N.H. May 17, 2024). The facts and circumstances of a particular

case dictate whether contributions from a family member constitute regular income. *Durov*, 2017 WL 977026, at * 5 (citations omitted).

Here, the Debtor made no claim at the evidentiary hearing that his non-filing spouse would or could make regular contributions to him by which he could fund his plan payments. Rather, he testified that his spouse was on reduced pay due to surgery and would soon retire. He said that, in retirement, his spouse would have only Social Security in an unknown amount as her income. He presented no evidence through any witness or document of his spouse's willingness, ability, duty or commitment to provide him with the regular income needed to establish Chapter 13 eligibility. To the contrary, Trustee Prillaman testified that the Debtor's spouse declined to voluntarily cooperate in the production of her tax returns requested by the Trustee. Any contributions she makes for their joint living expenses is not regular income to the Debtor for bankruptcy purposes and do not support a finding of eligibility for Chapter 13.

### *B.  Government Payments Assigned by the Debtor's Mother*

Larry Gray testified and the IRS transcripts entered into evidence confirm that the Debtor received government farm payments for the years 2018 through 2023. No such income is shown on the IRS transcript for 2024. The Debtor did not disclose on any of his bankruptcy schedules or other papers that he received any government farm payments in 2024, although he did disclose the payments for prior years.

The issue of whether such payments are regular income arises only because, when the Debtor testified that his income at the time of filing was "zero," Attorney Reinbold attempted to correct him by asking about the government farm payments and implying that he was receiving such payments when he filed. The Debtor's answer was unclear, thus raising the possibility that the Debtor may be claiming that the payments establish regular income for Chapter 13 eligibility. They do not.

All the evidence, including Larry Gray's testimony, the IRS transcripts, the Debtor's original and amended schedules, and the Debtor's original and amended Statement of Financial Affairs, provide proof that no government farm payment was made to the Debtor in 2024. The Debtor did not have this source of income at any time relevant to the Motion to Convert, and such payments may not therefore be considered regular income for purposes of establishing Chapter 13 eligibility.

### C.  Potential Salary from Son's New Business

At the evidentiary hearing, the Debtor relied primarily on his potential salary from his son's new business to establish his eligibility for Chapter 13. He claimed that he was going to be working as a part-time consultant evaluating development opportunities in the Texas real estate market. For that work, the Debtor claimed that he would be paid $150,000 per year. The Debtor described the new business as still in the capital formation stage and without any income.

As set forth above, to establish Chapter 13 eligibility, a debtor's income must be regular and stable. Speculating that income will be forthcoming from operating a business that is unsupported by any documentation is not sufficient. *In re Ansin*, 659 B.R. 715, 725-26 (B.A.P. 1st Cir. 2024). A court must be presented with a factual basis to determine the stability and regularity of income, including potential income from a family-owned business. *In re Mozer*, 1 B.R. 350, 352 (Bankr. D. Colo. 1979). Income that is contingent on future property sales or unsupported by historical sales records is insufficient to meet the burden of proof. *See, e.g.*, *In re Nealen*, 407 B.R. 194, 204 (Bankr. W.D. Pa. 2009); *In re Kapner*, 1991 WL 136203, at *1 (E.D. Pa. July 22, 1991).

Here, the Debtor's presentation on his projected income was so cursory that it left the Court with more questions than answers. He said that the business was in the capital formation stage. He did not define what he meant by that phrase, but it likely suggests that the Debtor's son is still looking for a loan or investors to fund the business operation. If that is the case, then it also seems likely that the business would need to identify one or more projects whose development or rehabilitation might be undertaken with such loan proceeds or investments. Until projects are identified and funds are secured based on a project budget, a question exists as to where the funds would come from to pay the Debtor and how anyone—including the Debtor and his son—could know what funds will be available to pay salaries or whether a $150,000 salary could be justified for part-time work on the project.

Further, questions remain about both the Debtor and his son. The Debtor said that he had been involved in the development of various properties over the years, but he did not say that he had enjoyed any particular success in such endeavors. He has no savings, investments, or retirement funds earned from such work. And although the Court makes no judgment about the merits of LHT's adversary complaint, it is clear that the Debtor's last development project resulted in significant and contentious litigation in Texas, two related-entity bankruptcies filed in Delaware, and the Debtor's personal bankruptcy filed here.[5] Such a track record offers no support for the Debtor's cavalier testimony that he expects a significant salary from the yet-to-be-funded new business.

Likewise, no meaningful information was provided about the Debtor's son. He was described as a banker in Chicago, but his education, experience, skills, and expertise were not even mentioned. Nothing was presented to suggest that he has the financial wherewithal to borrow significant sums—or any sums at all—to fund a Texas development project or that he has the resources himself to fund the business. He did not testify, and, accordingly, his intentions and commitment to the business are unknown.

It appears to the Court that the son's new business and the Debtor's employment position with the business were created to establish Chapter 13 eligibility. The Debtor's salary was described by Attorney Reinbold when the Motion to Convert was filed in June, but the business was still in a formative

---

[5] The Debtor's amended voluntary petition disclosed the two bankruptcies of related entities filed in Delaware on September 18, 2024: *In re Long Pine LLC*, Case No. 24-121717, and *In re Sunset Ridge Partners GP, LLC*, Case No. 24-12172.

stage in September. And absolutely no evidence was presented to suggest that the new business will have any projects to develop in the near future or will have the funding from loans or investors to proceed with any projects that might be identified. If the Debtor's son intends to fund the business himself to help out his father, his commitment to do so must be scrutinized under the same standards discussed above with respect to a non-filing spouse's contributions. Evidence should have been presented about the son's willingness, ability, duty, or commitment. In particular, under the circumstances here, evidence of the son's ability to fund a $150,000 salary for some length of time should have been presented and been subject to cross-examination by LHT's counsel. The paucity of evidence here about the business and its prospects clearly leads to the conclusion that the Debtor failed to meet his burden that his projected salary from his son's business is or will be sufficiently regular and stable to make him eligible for Chapter 13.

## IV.    Conclusion

The Debtor wholly failed to establish eligibility to be a Chapter 13 Debtor. He had no income when the case was filed and continued to have no income throughout the pendency of the case, including on the date his Motion to Convert was heard.[6] He insists that he can come out of retirement and begin to earn

---

[6] Even if the Debtor had provided evidence that he had received one or more paychecks or that his employment had otherwise commenced before the hearing, the result here would be the same absent evidence about the actual financial condition of the business and the Debtor's son. The issue is not whether the Debtor was employed or had received income from such employment as of the hearing date. The issue is whether the Debtor actually has a regular and stable source of income based on the facts and circumstances presented to the Court.

$150,000 per year for part-time consulting work. But his saying so does not make it so. He was unable to provide any details of his son's new business that would support a finding that the Debtor has or will have regular and stable income. The son did not testify, and therefore no evidence was presented regarding his commitment or ability to fund his father's salary. In the absence of any meaningful testimony about the new business and the prospects for the Debtor to actually be employed and earn regular and stable income, the Motion to Convert must be denied.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

See written Order.

###